## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOHN PARKS**, | Case No. 3:24-cv-1198-JR |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **LAKE OSWEGO SCHOOL DISTRICT; LAKE OSWEGO SCHOOL BOARD; MARSHALL HASKINS; OREGON SCHOOL ACTIVITIES ASSOCIATION;** and **PORTLAND PUBLIC SCHOOLS**, | |
| Defendants. | |

M.E. Buck Dougherty III, LIBERTY JUSTICE CENTER, 7500 Rialto Boulevard, Suite 1-250, Austin, TX 78735; and Luke D. Miller, MILLER BRADLEY LAW LLC, 1567 Edgewater Street NW, PMB 43, Salem, OR 97304. Of Attorneys for Plaintiff.

Karen O'Kasey, Taylor B. Lewis, and Zachariah H. Allen, HART WAGNER LLP, 1000 SW Broadway, Twentieth Floor, Portland, OR 97205. Of Attorneys for Defendants Lake Oswego School District and Lake Oswego School Board.

**Michael H. Simon, District Judge.**

Plaintiff John Parks ("Parks") brings this action against Defendants Lake Oswego School

District (the "District"), Lake Oswego School Board (the "Board"),[1] Marshall Haskins

---

[1] The Court refers to the District and the Board collectively as the "School Defendants."

("Haskins"), Oregon School Activities Association ("OSAA"), and Portland Public Schools ("PPS").[2] Against the School Defendants, Parks asserts two claims under 42 U.S.C. § 1983, alleging that they committed First Amendment retaliation and deprived Parks of procedural due process, in violation of his rights under the First and Fourteenth Amendments, respectively. Against Haskins, OSAA, and PPS, Parks alleges that they are liable for common law defamation under Oregon law.

Now before the Court is Parks' motion for preliminary injunction against the School Defendants based solely on his claim of First Amendment retaliation. ECF 8. Specifically, Parks asks the Court for a preliminary injunction "ordering Lake Oswego officials to restore him to his position as coach and teacher at Lake Oswego High School pending the outcome of trial." *Id.* at 12. The School Defendants filed a response opposing Parks' motion. ECF 14. The School Defendants included within their response a motion to strike the declarations of several parents of Lake Oswego High School students submitted by Parks in support of his motion for preliminary injunction. The Court denies the School Defendants' motion to strike as procedurally defective.[3] Parks filed a reply in support of his motion for preliminary injunction (ECF 24), and the Court heard oral argument on November 22, 2024. Both sides declined the Court's invitation to present witness testimony at the hearing. For the reasons explained below, the Court denies Parks' motion for preliminary injunction.

---

[2] Parks filed this lawsuit on July 24, 2024, only against the School Defendants. ECF 1. On October 7, 2024, Parks filed his First Amended Complaint ("FAC"), adding Haskins, OSAA, and PPS as additional defendants. ECF 7. These additional defendants have not yet filed appearances in this action.

[3] Because their motion to strike was included within the School Defendants' response and not filed as a separate motion, it was not filed in accordance with Local Rule 7-1(b).

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest.[4] *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (quotation marks omitted). Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips *sharply* in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012) (emphasis added).[5]

---

[4] When a public (or governmental) entity is the defendant, the third and fourth requirements merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

[5] In a 2024 decision, the Ninth Circuit appears to have limited the "serious questions" test to cases involving serious *factual* questions that need to be resolved. *See Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). The cases cited in *Assurance Wireless* in support of that proposition, however, do not limit the serious questions test only to factual disputes.

In addition, the already high standard for granting a preliminary injunction is further heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction).

> A mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citations, quotation marks, and brackets omitted). In this context, "status quo ante litem" means "the last, uncontested status which preceded the pending controversy." *Id.* (citation and quotation marks omitted). The School Defendants argue that Parks is seeking a mandatory injunction and that he cannot satisfy its "doubly demanding" standard. Parks replies by asserting that he is not seeking a mandatory injunction but merely trying to preserve the status quo. Parks adds that even if the Court concludes otherwise, he has satisfied the more demanding standard. The Court addresses this issue below.

Finally, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enterprises., LLC v. Fla. Ent. Mgmt., Inc*., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## FACTUAL FINDINGS[6]

Parks has been a high school teacher since 1995. ECF 7-8 at 3. Before coming to Lake Oswego High School ("LOHS") in the latter part of 2023, Parks taught at West Salem High School in Salem, Oregon, from 2009 to 2023. *Id.* Effective August 30, 2023, Parks accepted a "temporary assignment" to serve at LOHS for ten months as a Special Education Assistant II, through June 13, 2024. ECF 16-1; ECF 16-2. In addition, in early 2024, Parks accepted an "Extra Duty Coaching Assignment" at LOHS, effective February 26, 2024, through May 11, 2024. ECF 16-3. In a box titled "Dates of Assignment" showing "2/26/26" through "5/11/24," Parks initialed the statement, "I understand that the term for this assignment is limited to the dates listed above." *Id.*

The OSAA 6A high school track and field State Championship was held on May 17-18, 2024, in Eugene Oregon ("State Championship"). ECF 25 ¶ 8; ECF 16-4, at 1. Parks coached the LOHS track and field team at that State Championship, which the LOHS team won. ECF 25 ¶ 8. McDaniel High School ("McDaniel HS"), which is in the Portland School District, also sent a track and field team to the State Championship. One of the student members on the McDaniel team was an African American transgender track athlete. ECF 16-4 at 1.

Quite early in the morning of May 15, 2024, at 1:31 a.m., two days before the beginning of the State Championship, Parks sent an email to Peter Weber ("Weber"), Executive Director of the OSAA, with a copy to Kelly Foster ("Foster"), the OSAA's Assistant Executive Director. ECF 8-1 ¶ 6; ECF 7-1 at 2. The first paragraph and the first three sentences of the second paragraph of Parks' email read as follows:

---

[6] The Court finds the facts stated in this section by a preponderance of the evidence based on the declarations and exhibits filed by the parties.

I am writing first as the Lake Oswego HS head track coach but
secondarily as coach in the sport at Olympic, NCAA and
professional ranks for decades prior to my current position. The
impending competition of a high level transgender athlete for
McDaniel HS has placed the OSAA policy in national and world
eyes and is going to serve as a major distraction for all the athletes
attending to compete and celebrate the culmination of their sport.
The current policy has major flaws that are inviting the discrediting
of the entire existence and value of female athletics. Personally, it
will impact my athletes in the 400 meters directly and play a role
in who qualifies for finals and is awarded team trophies.

Having watched the McDaniel athlete at the Sherwood Invitational
and Dean Nice Invitational I can assure you that this athlete has
significant improvement to gain and could do so quickly enough to
win not just the 200 meters they are state leader in but the 400
meters where my 2-time defending state champion Josie D[] looks
to lower her personal best which is a state record that she broke
earlier this year that had stood for 20 years. Many coaches
observing have felt the McDaniel athlete has been holding back,
fearing that running too fast will bring a reversal in the rule. Being
only a second off my athlete who ranks 7th in the nation in HS in
the 400 meters is inviting heightened national attention to the
issue.

ECF 7-1 at 2 (brackets added to redact Josie's last name). In his penultimate paragraph, Parks

wrote:

The OSAA already has state meet events for para athletes in
wheelchair and Unified competition. The solution to trans athletes
is to have an open category like a gender neutral bathroom. Allows
competition opportunities but doesn't make a mockery of the
reason females compete in their own category. As a social studies
educator for 30 years I 100% support transgender students in every
educational, academic and societal situation except in athletics
where their bodies have a major physical and hormonal advantage.
The McDaniel athlete admitted a month ago in a newstory that
they wanted to take the hormone adjusting drugs so they didn't
have this advantage. When the individual is admitting this then it's
the administrators that are failing. I have 2 trans extended family
members and neither support male to female trans athletes
competing in female divisions because they said it draws only
negative attention to the trans community, alienating too many in
society they wish to gain the support of in other transgender legal
efforts.

PAGE 6 – OPINION AND ORDER

*Id.* at 3.

At 8:10 a.m. on the morning of May 15th, Foster forwarded to Chris Coleman

("Coleman"), the Athletic Director at LOHS, a copy of Parks' email to the OSAA. ECF 15-1.

Shortly after receiving that email, Coleman met with Parks. ECF 15 ¶ 3. According to Coleman:

> I told him I received the letter. I instructed him that while he was
> coaching at the state track and field high school finals, starting the
> next day, he was not to discuss transgender student participation
> with anyone at the meet. I instructed him that if anyone brought up
> the subject, he was to respond, "My athletic director has directed
> me not to talk about it." I reminded him that he would be
> representing LOHS at the state finals and that his focus needed to
> be the school's athletes and their hard work, accomplishments and
> success, not the settled rule for the competition and participation of
> transgender athletes.

*Id.*

Also during the morning of May 15th, Parks visited Kristen Colyer ("Colyer"), the

Principal at LOHS, in Colyer's office. As Colyer describes their discussion:

> On the morning of May 15, 2024, plaintiff came to my office. He
> expressed his view that a McDaniel transgender athlete should not
> be participating in the state high school track and field finals
> starting the next day. *He was worried that this athlete would beat
> our school's top 400m women's runner.* I reminded him that the
> school and OSAA had to follow Oregon law on this issue. I
> emphasized that the focus of his job at the state finals should be
> supporting our student-athletes and celebrating their
> accomplishments and successes.

ECF 16 ¶ 5 (emphasis added).

As noted, the State Championship took place on May 17-18, in Eugene. During the final

day, LOHS's Athletic Director, Coleman, called Parks. As Coleman describes the conversation:

> On Saturday, May 18, 2024, I called plaintiff to remind him of the
> school's expectations at the State Finals. I again instructed him not
> to discuss issues regarding transgender athlete participation while
> he was on duty coaching. Shortly after that call, I sent plaintiff a
> text message in follow-up.

ECF 15 ¶ 4. Coleman's text message, sent on Saturday, May 18th, at 11:52 a.m., reads:

> Just to follow up. We need to remind our kids to remain classy and
> respectful. They have transgender teammates and classmates. They
> are representing not just themselves, but our team and school.
> Nothing they do today in the heat of the moment is going to create
> the change they're wanting. But it could create a lot of blowback
> and negative attention on them and the school. Please encourage
> them not to be impulsive in their response, but be proud of their
> accomplishments and all the hard work they put in to get where
> they are. Thank you.

ECF 15-2.

Within a week, however, on May 24, 2024, an email was sent to the School District,

describing certain actions allegedly taken by Parks during the State Championship. The email

came from Haskins, a senior director for athletics at PPS. ECF 16-4. Haskins sent his email to

Lou Bailey ("Bailey"), the Executive Director of Secondary Schools and Title IX Coordinator at

the School District; and to Larry Ramirez, the Director of Secondary Schools at the Salem Keizer

School District. *Id.* at 3. (As noted, before coming to LOHS in 2023, Parks worked at West

Salem High School from 2009 to 2023. ECF 7-8 at 3.) Haskins also copied, among others,

Donna Watson ("Watson"), the Executive Director of Human Resources at the School District;

Weber and Foster at the OSAA; and Mary Kane, Senior Legal Counsel at PPS. ECF 16-4 at 3.

In his May 24th email, Haskins began:

> As a representative of Senior leadership for Portland Public
> Schools and as a member of the OSAA Executive Board, who has
> been appointed as the state representative for Equity, Diversity and
> Inclusion, I was appalled, disappointed and embarrassed for Lake
> Oswego and Salem Keizer School districts because of the behavior
> of one of your employees.

ECF 16-4 at 1. Haskins then referenced the May 15th email that Parks had sent to the OSAA and

several actions allegedly taken by Parks before and during the State Championship. *Id.* at 1-2. On

May 28, 2024, Bailey responded to Haskins, acknowledging receipt of Haskins' "email and

formal complaint." *Id.* at 1. Bailey also said that "LOHS administration will be processing it per

our Discrimination Complaint Procedure - policy AC-AR and will be in contact with you." *Id.*

After receiving the May 24, 2024, formal complaint from Haskins, LOHS's Principal,

Colyer, "conducted an investigation on behalf of the District," speaking with "several witnesses,

including coaches." ECF 16 ¶ 7. Among other things, Colyer learned the following based on her

investigation:

> A female athlete from another school submitted a written
> statement. She stated that plaintiff approached her after one of her
> preliminary heats at the State Finals. She reported that plaintiff told
> her he had talked to the parents of other 400-meter women's
> competitors about not standing on the podium after the next day's
> 400-meter final (an event that the McDaniel transgender athlete
> was competing in). Plaintiff had told her that she could just stand
> behind the podium and allow the McDaniel athlete to stand up
> there alone, and that she could go up to get her medal afterwards.

*Id.* ¶ 12. Colyer also learned:

> Another coach reported that he was standing about 50 meters away
> from plaintiff at the women's 400-meter event final and, after Lake
> Oswego's athlete beat the McDaniel athlete for first place, the
> coach heard plaintiff exclaim, "she beat the fucking dude!"

*Id.* ¶ 13.[7]

---

[7] In his Second Declaration, Parks states: "I never called the McDaniel HS transgender
athlete a 'fucking dude.' Nor did I direct any negative or derogatory comments toward the
McDaniel HS transgender athlete at the state championship." ECF 25 ¶ 9. Parks also states:

> I have reviewed Principal Colyer's Declaration [ECF 16], and I
> have never been provided with the names of the "coaches" who
> purportedly heard I said certain things at the state championship.
> Therefore, I deny anything that has been attributed to me by
> anonymous people regarding what I said at the state championship.
> I was not insubordinate at the state championship and did not
> violate any rules or policies, nor did I say anything negative or
> derogatory toward the McDaniel HS transgender athlete at the state
> championship.

On June 12, 2024, Colyer gave Parks a copy of her "Complaint Findings and Summary," with copies sent to Coleman, Watson, and Bailey. ECF 7-4. Among her findings, Colyer states:

> • There is evidence that Athletic Director, Chris Coleman, directed Coach Parks not to discuss issues related to transgender athlete participation in athletic events, specifically at the OSAA state track meet.
>
> \* \* \*
>
> • There is evidence that John Parks communicated with student-athletes at the state meet, recommending they not participate in medal presentation if transgender student-athletes from McDaniel High School won either the 200 M or 400 M race. This is a violation of school board policies: *AC - Nondiscrimination and JFCF - Hazing, Harassment, Intimidation, Bullying, Menacing, Cyberbullying, Teen Dating Violence, or Domestic Violence.*
>
> • There is evidence that Coach John Parks spoke with coaches, student-athletes, and their families before and during the state meet regarding what their athletes' plans were if the transgender student were to win and be on the medal stand. This is a violation of school board policies: *AC - Nondiscrimination and JFCF - Hazing, Harassment, Intimidation, Bullying, Menacing, Cyberbullying, Teen Dating Violence, or Domestic Violence*.
>
> \* \* \*
>
> • There is evidence that Coach Parks was insubordinate to the directive given by the Athletic Director not to discuss issues related to transgender athlete participation in athletic events, specifically the OSAA state track meet.

*Id.* at 2-3. Based on these findings, Colyer closed with the following "Summary," in relevant part:

> After reviewing all of the information and circumstances around this incident, there is a preponderance of the evidence that indicates that Coach John Parks was insubordinate and discriminated against the McDaniel High School transgender athlete. This violates board policies *AC - Nondiscrimination and*

---

*Id.* ¶ 10; *see also* n.9, *infra*.

> *JFCF - Hazing, Harassment, Intimidation, Bullying, Menacing,*
> *Cyberbullying, Teen Dating Violence, or Domestic Violence.*
>
> Follow-up with Coach John Parks is necessary. As personnel
> issues are not discussed, specific information regarding the
> follow-up will not be available to the complainant.

*Id.* at 3.

Also on June 12, 2024, Colyer gave Parks a separate letter, which reads, in its entirety:

> Following a thorough investigation into the events that transpired
> during the past track season, the preponderance of the evidence is
> that your actions and behaviors displayed towards a transgender
> athlete were in violation of the Lake Oswego School District
> School Board Policies AC - Nondiscrimination and FCF - Hazing,
> Harassment, Intimidation, Bullying, Menacing, Cyberbullying,
> Teen Dating Violence, or Domestic Violence.
>
> As an educational institution, we are committed to providing a safe
> and inclusive environment for all students. In light of these
> findings, the Lake Oswego School District has decided that the
> District cannot support your actions and behaviors. The length of
> any coaching contract is for the current season only. Consequently,
> we will open the cross country and track coach positions for Lake
> Oswego High School for the 2024-25 school year.
>
> Thank you for your understanding and cooperation.

ECF 7-5. The District paid Parks "in full for both his 2023-24 educational assistant contract and

his Spring 2024 track-and-field coaching contract." ECF 16 ¶ 15.

On June 25, 2024, Parks sent a letter to Colyer, appealing what he described as his

"termination" from his "position as Head Coach for Track & Field and Head Coach for Cross

Country. ECF 7-6 at 2. In relevant part, Parks wrote:

> This is official notice of my appeal of the termination of my
> position as Head Coach for Track & Field and Head Coach for
> Cross Country. You note the positions require applying yearly but
> that was not required prior to the 2024 track season nor has the
> process been done for all the other coaches at LOHS.
>
> The basis of the appeal is that the findings in the letter I was given
> on June 12, 2024, are not based on fact. Furthermore, the school

PAGE 11 – OPINION AND ORDER

has violated my First Amendment rights by terminating me for expressing my personal beliefs in support of Title IX. (*Pickering v. Board of Education AND Kennedy v. Bremerton*) In addition, the school has also acted illegally as there is no evidence that the school has silenced all discussions on this topic, just that they have attempted to silence my position, which is in violation of the law. (*Tinker v. Des Moines Independent Community School District*).

*    *    *

For all of the reasons above, I request immediate reinstatement to my positions as Head Coach of Track and Field, Head Coach of Cross Country, and restoration of my position in the Access program as an Instructional Assistant.

*Id.* at 2-6. In addition, Parks challenged the factual accuracy of Colyer's findings. *Id.*

Three days later, on June 28, 2024, Parks sent an email to Dr. Jennifer Schiele

("Schiele"), Superintendent of the School District. ECF 17-1. Parks' email to Schiele states, in its

entirety:

I am formally requesting an appeal to the school board over the investigation that I responded to 2 days ago. Having not been provided guidance on the board appeal process I am requesting this from you at this time.

The response that seems to be your view is that I was in one year positions in both coaching and as an instructional aide but those roles do NOT lose their 1st Amendment rights as was made clear in the decision Kennedy v Bremerton Schools in 2022. But the termination letter that principal Colyer handed me at the end of the meeting and she termed it that, made clear as well that because of the investigation I was not being renewed.

Given that I was never required to reapply for my coaching positions in prior years nor have any of the assistants or other coaches at LOHS and that Principal Colyer told me I was not being asked back because of these findings I am well within my rights and the policy to appeal both the findings and the subsequent decisions made regarding my employment based on those findings.

It should be noted that I have spoken to many LO coaches in other sports led by football coaches and they are telling me they are 100% behind me and are waiting to see how my situation is finalized and they plan a significant response.

> I would hope you would have a 3rd party non-biased entity take a
> look at the failings of the initial complaint, some failures in the
> investigation led by a failure to consider my 1st Amendment
> protected rights and a failure to provide lawful evidence as
> protected in the 6th Amendment. I will await your response as does
> the Lake Oswego community.

*Id.* Schiele responded on July 1, 2024, stating:

> I have reviewed your LOSD contracts and you signed two
> temporary contracts both of which have expired. There is no
> termination to appeal. You are welcome to apply for any 2024-25
> positions. As we have said to your lawyer, please address any
> communication to the district's legal representative, Nancy
> Hungerford. I have included her in this email and her phone
> number is . . . Thank you!

*Id.* (telephone number redacted).

Eleven days earlier, on June 17, 2024, the District posted job openings for the Fall 2024
cross-country head coaching position at LOHS and for the Spring 2025 track coaching position
at LOHS. ECF 18 ¶¶ 2-3. The former position was kept open until July 18, 2024, and the latter
position was kept open until September 20, 2024. *Id.* Both positions have since been filled.
ECF 15 ¶¶ 5-6. The parties dispute whether Parks ever applied for the 2024-25 cross-country or
track-and-field coaching positions. Both Colyer and Watson state in their declarations that Parks
never applied for either position. ECF 16 ¶ 16; ECF 18 ¶¶ 2-3. In his Second Declaration, Parks
states: "On advice of counsel, I applied for the cross country and track and field positions for
the 2024-25 school year." ECF 25 ¶ 12.

Finally, LOHS's Principal, Colyer, states in her declaration: "The District would have
opened up plaintiff's coaching positions at Lake Oswego High School to other applicants based
solely on the report that plaintiff, while coaching the track and field team at the State Finals, had
referred to a female transgender competitor as a 'fucking dude.'" ECF 16 ¶ 18. Superintendent
Schiele makes a similar point in her declaration, stating: "The District would have opened up the

track-and-field head-coaching position at Lake Oswego High School based solely on the report that plaintiff, while coaching the track and field team at the State Finals, had referred to a female transgender competitor as a 'fucking dude.'" ECF 17 ¶ 4.

## DISCUSSION

### A. Whether Parks Is Seeking a Mandatory or a Prohibitory Injunction

In his motion, Parks asks the Court for a preliminary injunction "ordering Lake Oswego officials to *restore* him to his position as coach and teacher at Lake Oswego High School pending the outcome of trial." ECF 8 at 12 (emphasis added). The School Defendants argue that Parks is seeking a mandatory preliminary injunction, which requires substantially more of a movant than does a prohibitory preliminary injunction. Parks replies that he is not seeking a mandatory injunction but merely attempting to preserve the status quo. ECF 24 at 18-19. Parks argues that "through their prior course of dealing" Parks' positions "automatically roll over and continue his employment at Lake Oswego High School to the next school year." *Id.* at 18. The parties dispute whether Parks' employment, either as a Special Education Assistant or as an athletic coach, "automatically roll over." In support of their position, the School Defendants offer declarations plus Parks' written terms of agreement. ECF 16-1 through ECF 16-3. In support of his position, Parks offers his declaration.

Regardless of how the factfinder at trial may ultimately resolve the various disputes between the parties, several things are undisputed. At the time when Parks filed his motion for preliminary injunction on October 7, 2024 (ECF 8), he was not employed by or working for the School Defendants in any capacity, he was not being paid by the School Defendants in any capacity, the 2024-2025 school year had already begun, and the School Defendants had already hired the cross-country and track-and-field coaches for the 2024-2025 school year. *See* ECF 15 ¶¶ 5-6. Parks may argue that he is legally entitled to those positions (or to be paid appropriate

monetary compensation for their loss), but on October 7th, the School Defendants were not threatening to do something in the future that Parks wanted the Court to prevent from occurring. The School Defendants had already taken their action. Parks now is asking for an order directing the School Defendants to reverse their action and "restore" Parks to his former employment, to which he claims he is legally entitled.

As explained by the Ninth Circuit:

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Ct.*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.

> The *status quo ante litem* referenced in *Chalk* means the last, uncontested status which preceded the pending controversy.

*Marlyn Nutraceuticals*, 571 F.3d at 878-79 (cleaned up).

In his reply brief, Parks cites the Ninth Circuit's decision in *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022), for the proposition that a "mandatory injunction is one that goes beyond simply maintaining the status quo and orders the responsible party to take action pending the determination of the case on its merits." *Id.* at 111. In *Doe*, two teenagers alleged that a provision of Arizona law that precluded coverage for gender reassignment surgeries is unconstitutional. The plaintiffs sought a preliminary injunction compelling Arizona's Medicaid program to pay for their immediate chest reconstruction surgeries. The challenged provision, however, had been in effect well before the plaintiffs sued. The district court classified the requested injunction as a

mandatory injunction because the plaintiffs sought "an injunction that not only enjoins Defendant from enforcing the law, but orders Defendant to take an affirmative action by providing coverage for a medical procedure that would otherwise be excluded, thus going well beyond the status quo," and "the relief sought would completely change, rather than preserve, the status quo." *Id.* at 108, 111 (quotation marks omitted). The Ninth Circuit agreed, explaining that "rather than maintain the status quo pendente lite, the Plaintiffs sought to compel Defendant to act prior to the entry of a final judgment." *Id.* at 111. Thus, *Doe* affords Parks no assistance.

At oral argument, Parks also referred to the Fourth Circuit's decision in *Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017). In that case, the Fourth Circuit held that "a motion for preliminary injunction filed *before the act to be enjoined has occurred*, and subsequently intended to restore the status quo once it has been disturbed, is not moot." *Id.* at 232 (emphasis added). SPX had sent letters to a union and its counsel on March 18, 2014, informing them that SPX would change the structure through which it provided medical benefits beginning January 1, 2015. The plaintiffs filed suit in November 2014 and filed their motion for preliminary injunction in December 2014. The district court noted that the last uncontested status in the case was in March 2014, when SPX provided health benefits to the plaintiffs and that the plaintiffs sought to prohibit SPX from changing the status quo by no longer providing benefits in the coming year. *Di Biase v. SPX Corp.*, 2015 WL 5714547, at *3 (W.D.N.C. Sept. 29, 2015). The district court thus classified the injunction as a prohibitory injunction seeking to "restrain[] Defendant from terminating the current SPX Plans for Medicare eligible retirees during the pendency of this action . . . and from implementing its 'New Approach to Retiree Health Care Coverage[.]'" *Id.* The district court *denied* the motion for preliminary injunction. *Id.* at *5. Although the Fourth Circuit agreed that the status quo was the situation that existed as of

March 2014, the Fourth Circuit did not classify the injunction as either prohibitory or mandatory but merely stated that preliminary injunctions can either maintain or restore the status quo. Thus, *Di Biase*, like *Doe*, does not aid Parks. As Parks' own motion requests, he is asking to be *restored* to the positions that he previously held; he is not asking to maintain the status quo that existed when he filed his motion.

Accordingly, as the Ninth Circuit stated in *Marlyn Nutraceuticals*, a district court should not issue a mandatory injunction "unless extreme or very serious damage will result," and especially not "in doubtful cases or where the injury complained of is capable of compensation in damages." 571 F.3d at 879 (quotation marks omitted). These factors all counsel against issuing the mandatory preliminary injunction that Parks requests. Neither extreme nor even very serious damage will result if such relief is not granted between now and the end of trial on the merits. Also, if Parks were to prevail after a trial on the merits, his injury would be compensable in damages, whether in the form of back pay, front pay, or noneconomic compensatory damages (or even, possibly, reinstatement). Finally, no one is restricting Parks' right to exercise free speech as this case progresses.

For all these reasons, the Court declines to issue a mandatory preliminary injunction. As a further independent and alternative ground for this result, the Court next examines the four traditional factors described by the Supreme Court in *Winter*.

**B.  Whether Parks Has Shown a Likelihood of Success on the Merits**

Parks asserts that the School Defendants violated his rights under the First Amendment by retaliating against him for sending the email that he sent on May 15, 2024, to the OSAA. To

prove a prima facie case on this claim,[8] Parks bears the burden of proving that: (1) he engaged in protected speech; (2) the School Defendants took an "adverse employment action" against him; and (3) his protected speech was a "substantial or motivating" factor for the adverse employment action. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022). If Parks can prove a *prima facie* case, the burden then shifts to the School Defendants to show that they can avoid liability on this claim by demonstrating either that they had "an adequate justification for treating [Parks] differently from any other member of the general public" (the "adequate justification" affirmative defense) or that they would have reached the same "adverse employment decision even in the absence of [Parks'] protected conduct" (the "same decision" affirmative defense). *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 752 (9th Cir. 2010) (quotation marks omitted).

### 1. Protected Speech

As a public employee, Parks must show that he spoke "as a private citizen" on a matter of public concern to receive protection against First Amendment retaliation. *Dodge*, 56 F.4th at 777. Parks argues that his May 15th email satisfies both requirements. In response, the School Defendants argue that Parks spoke in his position as a public employee, not as a private citizen.

"A person speaks in a personal capacity if he had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks he was paid to perform." *Id.* at 778 (cleaned up). Parks argues that his speech in his May 15th email did not occur within the scope of his official coaching duties but was made in his personal capacity as a private citizen.

---

[8] As noted, Parks is not relying on his procedural due process claim to support his motion for preliminary injunction.

In response, the School Defendants cite only a portion of Parks' opening sentence in his May 15th email: "I am writing first as the Lake Oswego HS head track coach[.]" The complete first sentence, however, reads: "I am writing first as the Lake Oswego HS head track coach but secondarily as coach in the sport at Olympic, NCAA and professional ranks for decades prior to my current position." ECF 7-1 at 2. The School Defendants argue that this shows that Parks was speaking in his official capacity as a public employee. Parks, however, sent this email from his personal email address and outside of normal working hours. In addition, and perhaps more importantly, Parks had no official duty that required him to make the statements in his May 15th email. Neither his role as a Special Education Assistant nor as track-and-field head coach included making policy statements. Although Parks' May 15th email related to track and field coaching, which is one of the tasks that Parks was paid to perform, sending that email was not one of Parks' job duties. Thus, Parks has shown a sufficient likelihood of success that he will establish that he spoke as a private citizen when sending that email.

Further, a person speaks on a matter of public concern when the speech "can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quotation marks omitted). The School Defendants do not dispute that Parks' May 15th email addressed a matter of public concern, namely the participation of transgender athletes in high school athletic competitions. Therefore, Parks has shown a sufficient likelihood of success that he will establish that his email was protected speech under the First Amendment.

### 2. Adverse Employment Action

To show an adverse employment action, Parks must prove that the actions taken by the School Defendants were "reasonably likely to deter [someone in Parks' position] from engaging in constitutionally protected speech." *Greisen v. Hanken*, 925 F.3d 1097, 1113 (9th Cir. 2019)

(quotation marks omitted). "[T]he key question is whether the retaliatory activity would chill or silence a person of ordinary firmness from continuing to speak out." *Dodge*, 56 F.4th at 779 (quotation marks omitted). The Ninth Circuit has noted that an adverse employment action does not need to be severe, and even "minor acts of retaliation" can suffice. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1079 (9th Cir. 2013). For example, "informal measures, such as the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," can violate the First Amendment. *Mulligan v. Nichols*, 835 F.3d 983, 989 n.5 (9th Cir. 2016) (cleaned up).

Parks alleges three adverse employment actions: (1) Colyer conducting an investigation into his statements and actions; (2) Colyer sending him the two letters dated June 12, 2024; and (3) the School Defendants refusing to rehire Parks for the track-and-field coaching position for the school year 2024-25. The School Defendants respond that a reasonable person would understand that conducting an investigation was not necessarily an indication of future discipline but merely something that the District was required to do after receiving a third-party complaint, *i.e.*, the formal complaint from Haskins. The School Defendants also contend that Parks did not suffer any discipline or burden because his coaching contract had already expired before the investigation began and Parks had been paid in full for his completed coaching work. Parks replies that he and the District had agreed to a course of dealing that would result in the "rolling over" of Parks's coaching contract to the next year without him needing to reapply. According to Parks, the School Defendants' refusal to rehire him was an adverse employment action.

The investigation into Parks and the School Defendants' refusal to renew his contract would likely chill protected speech. Even if the investigation was merely a formality, Colyer stated in writing that Parks violated the Board's nondiscrimination and anti-harassment policies and that a "follow-up" with him was necessary. Colyer also told Parks in writing that the District

"cannot support your actions and behaviors" and, thus, would "open the cross country and track coaching positions" for the 2024-2025 school year. Under these circumstances, these are adverse employment actions that could deter a reasonable person of ordinary firmness from continuing to engage in protected speech.

Although the School Defendants explain that the investigation and the decision to open the coaching positions for the following year were based on other conduct besides Parks' May 15th email, one of Colyer's letters mentions that email as a factor leading to the School Defendants' conclusion. Parks, therefore, has shown a sufficient likelihood of success that he will be able to prove that a reasonable person could believe that the investigation and the subsequent decision not to rehire him were at least in part motivated by his May 15th email and would therefore be deterred from making this sort of protected speech in the future. Thus, Parks has sufficiently demonstrated a likelihood of success in showing that he suffered an adverse employment action.

### 3.  Substantial or Motivating Factor

The Ninth Circuit has described three ways in which a plaintiff can show that retaliation was a substantial or motivating factor behind an adverse employment action. A plaintiff can:

> (1) introduce evidence that the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) introduce evidence that the employer expressed opposition to the speech; or (3) introduce evidence that the proffered explanations for the adverse action were false and pretextual.

*Anthoine*, 605 F.3d at 750. Parks focuses on the second factor.

Parks argues that in one of Colyer's two letters to Parks, she expressed opposition to his May 15th email. The School Defendants respond that although they learned about that email the day it was sent, they did not open an investigation until after receiving a formal complaint from

Haskins. The School Defendants acknowledge, however, that the School's Athletic Director,

Coleman, met with Parks the same day that the School Defendants received Parks' May 15th

email and that Coleman told Parks that he should not discuss transgender student participation in

athletics with anyone while coaching at the upcoming State Championship. ECF 15 ¶¶ 2-3. This

conversation, along with the express reference to Parks' May 15th email in one of Colyer's

letters, shows that the School Defendants expressed opposition to Parks' May 15th email. Thus,

Parks has shown a sufficient likelihood of success in establishing that his May 15th email was at

least a substantial or motivating factor behind the adverse employment actions.

### 4.  Affirmative Defense of "Same Decision"

As previously discussed, the School Defendants can defeat Parks's claim of First

Amendment retaliation by showing that they "would have reached the same decision even in the

absence of [Parks'] protected conduct." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir.

2004) (quotation marks omitted). As the Ninth Circuit has explained:

> Once a plaintiff has satisfied the first three steps, the burden shifts
> to a defendant to show whether it had an adequate justification for
> treating the employee differently from any other member of the
> general public.
>
> *    *    *
>
> If defendants fail to carry their burden on the fourth part of the test,
> they are nonetheless entitled to summary judgment if they can
> demonstrate that they would have reached the same adverse
> employment decision even in the absence of the employee's
> protected conduct. In other words, they may avoid liability by
> showing that the employee's protected speech was not a but-for
> cause of the adverse employment action. This question relates to,
> but is distinct from, the plaintiff's burden to show the protected
> conduct was a substantial or motivating factor.

*Anthoine*, 605 F.3d at 752 (cleaned up).

The School Defendants present evidence that another coach reported hearing, after LOHS's athlete beat the McDaniel athlete for first place in the women's 400-meter event final, Parks exclaim, "she beat the fucking dude!" and that Parks' exclamation was loud enough to be heard 50 meters away. Further, the School Defendants present evidence from LOHS's Principal, Colyer, confirmed by the District's Superintendent, Schiele, that the School Defendants would have "opened up" Parks' coaching positions at LOHS to other applicants based solely on the report that Parks, while coaching the track and field team at the State Finals, had referred to a female transgender competitor in that way. ECF 16 ¶¶ 13, 18; ECF 17 ¶ 4.[9] Thus, the Court finds that Parks has not shown a likelihood of success, or even serious questions, on the merits of his claim, based on the School Defendants showing likely success on their affirmative defense of "same decision."

**C.  Whether Parks Has Shown a Likelihood of Irreparable Injury**

To meet his burden for a preliminary injunction, Parks must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). "[U]nder the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by

---

[9] As noted, Parks denies calling the McDaniel High School transgender student by this epithet. ECF 25 ¶9. The Court, however, also notes that Parks was sitting at counsel table during the Court hearing while this issue was being discussed and Parks' counsel declined to have Parks provide testimony on this subject. From this, the Court finds that even if Parks did not make that statement *directly* to the McDaniel student after the 400-meter race (which Parks denies in his declaration), he nevertheless made that exclamation loud enough to be heard by another coach standing 50 meters away (as Colyer reports in her declaration). These facts likely will need further exploration and evaluation as the case proceeds, but for purposes of the pending motion for preliminary injunction, these are the factual findings of the Court. Further, because the Court finds that the School Defendants are likely to prevail on their affirmative defense of "same decision," the Court need not reach the School Defendants' alternative argument based on the affirmative defense of "adequate justification."

demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (quotation marks omitted); *see also Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quotation marks omitted). Thus, if Parks shows a likelihood of success of the merits (or even serious questions) regarding a violation of his First Amendment rights, that would be enough to show a likelihood of irreparable injury. Because Parks has not met his burden on the merits, however, he has not shown a likelihood of irreparable injury.[10]

### D. Whether the Balance of Hardships Tips (or Tips Sharply) in Favor of Parks

To support a motion for preliminary injunction, Parks also must show "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. As noted, when a public (or governmental) entity is the party defending against a motion for preliminary injunction, these two factors merge. *See Nken*, 556 U.S. at 435. Here, both the balance of equities and the public interest counsel against issuing the requested preliminary injunction.

When balancing the equities, "a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). A court must then weigh "the hardships of each party against one another." *Id.* "In exercising their sound discretion, courts of

---

[10] The School Defendants also argue that Parks has not shown a likelihood of irreparable injury occurring between now and the end of a trial on the merits because his freedom of speech is not in any way currently being curtailed, or even threatened, by the School Defendants. Thus, if any constitutional injury has occurred, it has already happened, and a preliminary injunction is not needed to prevent any reoccurrence. The School Defendants might be correct on this point, but based on the Court's other findings and conclusions, the Court need not reach this issue.

equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation marks omitted).

If a preliminary injunction is not issued, Parks faces the harm of having been improperly denied employment. If, however, the Court were to issue a preliminary injunction that restored Parks to his previous teaching and coaching positions, the School Defendants would then face the possibility that their students, as well as student-athletes competing against the LOHS, may feel unsafe, unwelcome, discriminated against, or harassed. Both harms are serious, but the Court finds that the balance of equities does not tip in favor of Parks, let alone tip sharply in his favor. Thus, the Court should not issue the requested preliminary injunction.

## CONCLUSION

The Court DENIES Parks' motion for preliminary injunction. ECF 8.

**IT IS SO ORDERED**.

DATED this 25th day of November, 2024.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge
