IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN PARKS,

Plaintiff,

v.

LAKE OSWEGO SCHOOL DISTRICT, LAKE OSWEGO SCHOOL BOARD, OREGON SCHOOL ACTIVITIES ASSOCIATION, PORTLAND PUBLIC SCHOOLS, and MARSHALL HASKINS,

Defendants.

Case No. 3:24-cv-01198-JR

FINDINGS AND RECOMMENDATION

FILED UNDER SEAL

RUSSO, Magistrate Judge:

Plaintiff John Parks brings this action against defendants Lake Oswego School District ("District"), Lake Oswego School Board ("Board"), Oregon School Activities Association ("OSAA"), Portland Public Schools ("PPS"), and Marshall Haskins. Against the District and the Board ("School Defendants"), plaintiff asserts First and Fourteenth Amendment claims under 42 U.S.C. § 1983. Against OSAA and Haskins/PPS ("PPS Defendants"), plaintiff alleges claims for common law defamation. The School Defendants, PPS Defendants, and OSAA now separately move for summary judgement pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, defendants' motions should be granted and this case should be dismissed.

## BACKGROUND[1]

Plaintiff has worked in various high schools since 1995. Opinion & Order 5 (Nov. 25, 2024) (doc. 33). Effective August 30, 2023, plaintiff accepted a "temporary assignment" to serve at Lake Oswego High School ("LOHS") for ten months as a Special Education Assistant II (i.e., through June 13, 2024). O'Kasey Decl. 23-24 (doc. 74).[2] Before coming to LOHS, plaintiff was employed as a social studies teacher at West Salem High School. Kilcullen Decl. Ex. 8, at 13 (doc. 89-8).

In early 2024, plaintiff accepted an "Extra Duty Coaching Assignment" at LOHS for track and field, effective February 26 through May 11, 2024.[3] O'Kasey Decl. 22 (doc. 74). In his corresponding paperwork, plaintiff expressly indicated that he "under[stoo]d the term for this assignment is limited to [those] dates." *Id.* LOHS Athletic Director Chris Coleman, who interviewed, hired, and supervised plaintiff, did not make any representations or guarantees about continued employment following the conclusion of the season. *Id.* at 18-19; Coleman Decl. ¶¶ 1-3 (doc. 75).

---

[1] The parties largely rely on duplicative deposition testimony as the basis of their respective positions. The Court generally cites to defendants' evidence except when referring to the non-duplicative information produced by plaintiff. And, to the extent plaintiff and defendants attack each other's recitation of facts, this Court is not bound by either party's characterization of the evidence and instead independently reviews the record to determine whether summary judgment is appropriate. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Only the facts borne out by the record are recounted herein, except where otherwise noted.

[2] One of the School Defendants' counsel, Karen O'Kasey, and one of plaintiff's attorneys, Brendan Philbin, did not individually label or number the exhibits attached to their declarations, such that the Court refers to the page numbers assigned in the docket in regard to those materials.

[3] Plaintiff had previously held an "Extra Duty Coaching Assignment" with LOHS for track and field between February 27 and May 13, 2023, while he was still teaching at West Salem High School. O'Kasey Decl. 21 (doc. 74); Kilcullen Decl. Ex. 8, at 13, 22 (doc. 89-8).

In the course of the track season, plaintiff saw an African American transgender athlete from McDaniel High School (male to female) compete. O'Kasey Decl. 10 (doc. 74); Kilcullen Decl. Ex. 8, at 84-85 (doc. 89-8). Plaintiff became "worried" that the McDaniel athlete would beat one of his athletes in the women's 400-meter event at the upcoming OSAA 6A high school track and field state championship on May 17-18, 2024 ("State Championship"). O'Kasey Decl. 10 (doc. 74).

Around May 10, plaintiff asked Coleman's permission to write to the OSAA and express his views on transgender athletes. *Id.* at 9. Coleman did not object to or tell plaintiff not to write the letter. *Id.* at 9, 12, 19. Coleman did, however, instruct plaintiff that the focus at the State Championship needed to be on LOHS's athletes and not transgender issues. *Id.* at 12, 42.

On May 15 at 1:31 a.m., plaintiff sent an email to Peter Weber, OSAA's Executive Director, copying Kelly Foster, OSAA's Assistant Executive Director, stating, in relevant part:

> I am writing first as the Lake Oswego HS head track coach but secondarily as coach in the sport at Olympic, NCAA and professional ranks for decades prior to my current position. The impending competition of a high level transgender athlete for McDaniel HS has placed the OSAA policy in national and world eyes and is going to serve as a major distraction for all the athletes attending to compete and celebrate the culmination of their sport. The current policy has major flaws that are inviting the discrediting of the entire existence and value of female athletics. Personally, it will impact my athletes in the 400 meters directly and play a role in who qualifies for finals and is awarded team trophies . . .
>
> Many coaches observing have felt the McDaniel athlete has been holding back, fearing that running too fast will bring a reversal in the rule. Being only a second off my athlete who ranks 7th in the nation in HS in the 400 meters is inviting heightened national attention to the issue. In the PIL district meet the athlete competing caused the other top athletes to lose focus and break down technically, physically and emotionally. The damage to all the natural born female competitors is real and devastating . . .
>
> Its plainly clear to every track coach in the Portland metro area I have spoken with that by next year if allowed this athlete will break [state and national records]. Allowing this travesty to be carried out is making a complete mockery of the meet

> this weekend and in the future until the rules are altered to protect natural born females . . .
>
> This weekend's meet is going to be the focus of US and international media only because of the failure of the OSAA to consider in their competition rules the impact on natural born girls. The OSAA already has state meet events for para athletes in wheelchair and Unified competition. The solution to trans athletes is to have an open category like a gender neutral bathroom. Allows competition opportunities but doesn't make a mockery of the reason females compete in their own category. As a social studies educator for 30 years I 100% support transgender students in every educational, academic and societal situation except in athletics where their bodies have a major physical and hormonal advantage. The McDaniel athlete admitted a month ago in a newstory that they wanted to take the hormone adjusting drugs so they didn't have this advantage. When the individual is admitting this then it's the administrators that are failing. I have 2 trans extended family members and neither support male to female trans athletes competing in female divisions because they said it draws only negative attention to the trans community, alienating too many in society they wish to gain the support of in other transgender legal efforts[.]

First Am. Compl. Ex. 1, at 1-2 (doc. 7-1).

At 8:10 a.m., Foster forwarded plaintiff's email to Coleman. O'Kasey Decl. 30, 43 (doc. 74). Shortly after receiving that email, Coleman met with plaintiff; Coleman did not reprimand plaintiff or tell him he should not have sent the email. *Id.* at 11-12. Rather, Coleman "showed support" and told plaintiff:

> I received the letter. I instructed him that while he was coaching at the state track and field high school finals, starting the next day, he was not to discuss transgender student participation with anyone at the meet. I instructed him that if anyone brought up the subject, he was to respond, "My athletic director has directed me not to talk about it." I reminded him that he would be representing LOHS at the state finals and that his focus needed to be the school's athletes and their hard work, accomplishments and success, not the settled rule for the competition and participation of transgender athletes.

*Id.* at 12, 43; Opinion & Order 6 (Nov. 25, 2024) (doc. 33) (citation and internal quotations omitted).

Also during the morning of May 15, plaintiff talked with Kristen Colyer, LOHS Principal. O'Kasey Decl. 19 (doc. 74). Colyer expressed her awareness and approval of plaintiff's email, but

also "reminded [plaintiff] that the school and OSAA had to follow Oregon law on this issue [and] emphasized that the focus of his job at the state finals should be supporting our student-athletes and celebrating their accomplishments and successes." *Id.*; Colyer Decl. ¶ 5 (doc. 74).

On May 18, during the second day of the State Championship, Foster called Coleman to report that she was hearing "some rumblings" that plaintiff was "having conversations with people about the transgender athlete participating" and "encourag[ing] athletes not to stand on the podium along with the transgender athlete if that's how the results ended." O'Kasey Decl. 44-45 (doc. 74); Kilcullen Decl. Ex. 9, at 48 (doc. 89-9). The transgender McDaniel athlete won the 200 meter race that day, but LOHS did not have any students competing and plaintiff did not award any medals at the ceremony ("because only the coach of the winning athlete does that"). O'Kasey Decl. 14 (doc. 74).

Coleman called plaintiff and instructed him (in plaintiff's words) "'not [to] be talking to other coaches and athletes, you know, for the rest of the meet about this.'" *Id.* at 13, 45. Plaintiff also recounted Coleman telling him "'we just want to keep things positive and have good reflection on [LOHS].'" *Id.* at 13. Shortly thereafter, Coleman sent plaintiff a text message:

> Just to follow up. We need to remind our kids to remain classy and respectful. They have transgender teammates and classmates. They are representing not just themselves, but our team and school. Nothing they do today in the heat of the moment is going to create the change they're wanting. But it could create a lot of blowback and negative attention on them and the school. Please encourage them not to be impulsive in their response, but be proud of their accomplishments and all the hard work they put in to get where they are. Thank you.

*Id.* at 45; Opinion & Order 8 (Nov. 25, 2024) (doc. 33) (citation and internal quotations omitted).

Marshall Haskins, PPS Athletic Director and volunteer member of the OSAA Executive Board, attended the State Championship and watched the 200 and 400 meter events, among others, and received reports about plaintiff while there. Vickers Decl. Ex. 1, at 5-8 (doc. 79-1); Radmacher

Decl. Ex. 203, at 11 (doc. 82-2); Kilcullen Decl. Ex. 2, at 2-3, 5-6, 19 (doc. 89-2); Kilcullen Decl. Ex. 9, at 40-41 (doc. 89-9). He also purportedly witnessed plaintiff walk into the stands and make comments like, "boys shouldn't be running against girls, things like that." Vickers Decl. Ex. 1, at 2 (doc. 99-1). Following the event, Haskins spoke with others who worked for PPS and OSAA, and held meetings with students and coaches, to "get . . . the information from them about things that occurred." Vickers Decl. Ex. 1, at 9-12, 16-36 (doc. 79-1); Kilcullen Decl. Ex. 2, at 9, 12-15 (doc. 89-2).

On May 24, Haskins sent an email to Lou Bailey, the District's Executive Director of Secondary Schools and Title IX Coordinator, and Larry Ramirez, the Salem Keizer School District's Director of Secondary Schools, describing certain actions allegedly taken by plaintiff during the State Championship. O'Kasey Decl. 29 (doc. 74); Colyer Decl. ¶ 6 & Ex. 4 (doc. 74). Haskins also copied, among others, Donna Watson, the District's Executive Director of Human Resources; Weber and Foster; and Mary Kane, PPS' Senior Legal Counsel. Colyer Decl. Ex. 4, at 1, 4 (doc. 74). In particular, Haskins wrote:

> As a representative of senior leadership for Portland Public Schools and as a member of the OSAA executive board who has been appointed as the state representative for equity, diversity, and inclusion, I was appalled, disappointed and embarrassed for Lake Oswego and Salem Keizer School districts[4] because of the behavior of one of your employees.
>
> All students deserve the ability to compete in interscholastic events without feeling discriminated against or fearful of how they will be treated at an event. Unfortunately, [plaintiff] went out of his way to make a PPS African American Transgender track athlete feel unwelcome and discriminated against throughout the 23-24 track season and at the OSAA 6A State Championships in Eugene.
>
> [Plaintiff's] behaviors were premeditated, calculated and discriminatory in an effort to deny our student's participation at the state tournament and to create a hostile

[4] Haskins apparently was not aware that plaintiff was no longer employed by the Salem-Keizer School District. Vickers Decl. Ex. 2, at 2 (doc. 99-2).

> environment to shame our student. Here are specific examples of the harassing discriminatory behavior:
>
> A. Sent email to OSAA in an effort to stop our student from participating at the state track meet.
>
> B. Contacted coaches from other schools prior to the state tournament asking them to submit letters, emails and call OSAA office to deny our student an opportunity to participate in the OSAA state tournament.
>
> C. Contacted coaches from other schools telling them to boycott medal presentation at state tournament.
>
> D. Coordinating phone calls with coaches to contact our families of student athletes related to state tournament participation.
>
> E. Harassing our student athletes and their families prior and during the state tournament forcing them to participate in his personal agenda though calls, email and on site inquires.
>
> F. Speaking negatively to our transgender student athlete on the podium at the medal presentation for the 200 M race.
>
> G. Communicating with student athletes at the state tournament, recommending they not participate in medal presentation if our student won either the 200 M or 400 M race.
>
> H. Riling up state tournament spectators in stands, including a large contingent from the Lake Oswego community to "boo" our student athlete during the medal presentation . . .
>
> [Plaintiff] should not be pushing his personal agenda. He should be following state law, OSAA policy while adhering to his responsibilities as a licensed educator and role model for student athletes teaching sportsmanship. In closing, I hope Salem-Keizer and Lake Oswego school districts do what is necessary to make sure this behavior is dealt with in a way that is student centered and ensures that hate and intolerance is not what teachers and coaches in your district model. This email shall serve as a Formal Complaint[.]

*Id.* at 1-3. Haskins sent this email because he obtained information from myriad people he "believe[d] to be credible" so that the allegations (i.e., those listed out as A through H) could be investigated by plaintiff's employer. Vickers Decl. Ex. 1, at 29-30, 37-38 (doc. 79-1);

On May 28, Bailey responded to Haskins: "We are in receipt of your email and formal complaint. LOHS administration will be processing it per our Discrimination Complaint Procedure - policy AC-AR[5] and will be in contact with you." *Id.* at 1.

---

[5] District policy requires an investigation of any report of discrimination or harassment; at step one of that process, "the principal shall investigate [the complaint] and determine the action to be taken,

After receiving Haskins' complaint Colyer "conducted an investigation on behalf of the District." Colyer Decl. ¶ 7 (doc. 74). As part of that investigation, plaintiff, with union representation, attended a meeting with Colyer on May 29. O'Kasey Decl. 14 (doc. 74); Kilcullen Decl. Ex. 5, at 65-66 (doc. 89-5). Colyer additionally "spoke to several witnesses," including Haskins, Foster, Coleman, and students and coaches who were at the State Championship. *Id.* at 31-32, 35-39 (doc. 74); Colyer Decl. ¶¶ 7-14 (doc. 74); Heslam Decl. ¶¶ 3-4 (doc. 76); Kilcullen Decl. Ex. 6, at 46-47 (doc. 89-6).

As part of that process, Colyer learned:

> plaintiff approached [a student athlete from another school] after one of her preliminary heats at the State Finals. She reported that plaintiff told her he had talked to the parents of other 400-meter women's competitors about not standing on the podium after the next day's 400-meter final (an event that the McDaniel transgender athlete was competing in). Plaintiff had told her that she could just stand behind the podium and allow the McDaniel athlete to stand up there alone, and that she could go up to get her medal afterwards.[6]

O'Kasey Decl. 31-32, 35-40 (doc. 74); Colyer Decl. ¶ 12 (doc. 74). She also received a report from another coach who was "standing about 50 meters away from plaintiff at the women's 400-meter

---

if any, and reply in writing, to the complainant within 10 school days of receipt of the complaint." O'Kasey Decl. 29-30 (doc. 74); *see also* Colyer Decl. ¶ 17 & Ex. 7 (doc. 74) ("District Policy AC-AR Discrimination Complaint Procedure").

[6] Plaintiff disputes this characterization of events insofar as he did not "recall saying those words . . . I think I said, 'Some of the kids are talking [about] protesting at the medal stand [against the participation of the transgendered student' so she knew] she could join." Kilcullen Decl. Ex. 8, at 60-63, 156-57 (doc. 89-8). He did not attempt to discourage such talk or actions with the student athletes because they were "upset" and "it's their damn right." *Id.* at 160-61. And plaintiff acknowledges being "fired up, emotional" and making a comment to Foster and another individual immediately prior to the 400-meter medal ceremony, while the students were waiting on the podium, that "this can't happen again," referencing the participation of the transgender McDaniel athlete. *Id.* at 86-89, 167-68, 185; Kilcullen Decl. Ex. 9, at 36 (doc. 89-9). Foster apparently responded: "It's the state law." Kilcullen Decl. Ex. 8, at 88 (doc. 89-8). According to plaintiff, he started to comment about Oregon Senate President Robert Wagner's support and the other individual cut him off, stating: "'That's enough,' or something like that." *Id.* at 184; Kilcullen Decl. Ex. 9, at 49 (doc. 89-9).

event final" that plaintiff exclaimed "'she beat the fucking dude!'" after LOHS's athlete came in first over the McDaniel athlete.[7] O'Kasey Decl. 31-32, 35-39 (doc. 74); Colyer Decl. ¶ 13 (doc. 74).

On May 31, plaintiff sent a letter to Wagner requesting that the state create an open division in which trans athletes could compete, and informing Wagner that he had been accused of discrimination by Haskins for his advocacy to the OSAA. First Am. Compl. Ex. 7, at 1-3 (doc. 7-7). Neither Wagner nor his office responded to plaintiff's letter. Kilcullen Decl. Ex. 8, at 114-15 (doc. 89-8).

On June 10, Coleman completed a "Coach Evaluation Form" for plaintiff. *See generally* Coleman Decl. Ex. 1 (doc. 75-1). Coleman did not indicate any areas of "exemplary" performance and provided "unsatisfactory" marks in the following categories: "Follows the advice of physicians/trainer regarding participation of injured athletes"; "Demonstrates, teaches, and enforces good sportsmanship"; "Knowns and conforms to district, league, and OSAA athletic policies and regulations"; "Provides continuity and articulation with other levels of the sport"; "Follows through with assigned tasks and responsibilities"; "Develops and monitors a clear and comprehensive organizational plan"; "Provides parents, athletic Directors, and administrators with appropriate and timely information, including game and practice schedules"; "Exchanges information and maintains a productive relationship with other coaches, including those in community programs"; "Inspires and engages athletes to participate in the sport"; and "Behaves

---

[7] Both Wayne McCall, LOHS Assistant Coach (who was interviewed as part of the investigation), and the parent of a female 400-meter competitor from another school at the State Championship purported to witness plaintiff yell, "She beat a fucking dude!" Heslam Decl. ¶¶ 5-7 (doc. 76); McCall Decl. ¶ 3 (doc. 77). Plaintiff disputes using this language for the first time at summary judgment and instead contends that he yelled from the stands where he was watching: "She fucking did it! Fifty-two [seconds]! She beat 'em!" Parks Decl. ¶ 9 (doc. 90-2). And, according to plaintiff, it was McCall who exclaimed, "She beat the fucking dude!" *Id.* at ¶ 10.

in an ethical manner at all times." *Id.* at 1-2. Plaintiff received "satisfactory" marks in all remaining areas. *Id.*

In the narrative portion of his evaluation, Coleman made the following comments:

> • I'm concerned with the increased number of overuse/overtraining injuries this past year. [The athletic trainer] also communicated w/me that you stopped sending athletes to him late in season.
> • I believe we are lacking in the areas of practicing and promoting good sportsmanship and sportsmanship is not being emphasized enough as a program.
> • You need to become more familiar w/OSAA rules . . . your communications w/athletes from other schools and w/your club is concerning. Budget planning and communication must improve. I'm concerned w/how [the budget] is being spent[.]
> • There was often confusion about meet/event start times. Communication needs to improve. I'm very concerned about your relationship w/other coaches[.]
> • I've heard from athletes, parents + coaches that not all athletes are feeling included, appreciated, and part of the program. I'm concerned that you have a win-at-all-costs mentality.

*Id.*; Kilcullen Decl. Ex. 6, at 59 (doc. 89-6). Coleman concluded by listing several recommended areas of growth/improvement, along with the following statement:

> While we have had great individual and team success, a positive culture does not exist within our track + cross country programs. Too much emphasis has been placed on the most skilled athletes and winning at-all-costs. I've received feedback from athletes, parents, and assistance coaches who echo those concerns. I'm also concerned your emphasis on winning is negatively impacting the organizations at our program's support systems.[8]

Coleman Decl. Ex. 1, at 3 (doc. 75-1).

On June 12, Colyer again met with plaintiff, who was accompanied by two union representatives. According to plaintiff, Colyer expressed opposition to the letter he wrote to Wagner because it was "illegal." Kilcullen Decl. Ex. 8, at 115-18 (doc. 89-8). In addition, Colyer

---

[8] In the course of his briefing, plaintiff only specifically refutes one aspect of Coleman's evaluation: "Coleman neglected to mention that he had previously given permission [to plaintiff] to use a former U.S. Olympic Team physician, instead of the school medical professional." Pl.'s Resp. to Sch. Defs.' Mot. Summ. J. 7, 13 (doc. 88); Parks Decl. ¶ 4 (doc. 90-2).

gave plaintiff her "Complaint Findings and Summary," with copies sent to Coleman, Watson, and Bailey. O'Kasey Decl. 25 (doc. 74). Colyer's findings are as follows:

> • There is evidence that [Coleman] directed [plaintiff] not to discuss issues related to transgender athlete participation in athletic events, specifically at the OSAA state track meet.
>
> • There is evidence [plaintiff] sent an email to OSAA as a representation of [LOHS] in an effort to stop the transgender student-athlete from McDaniel High School from participating. not to discuss issues related to transgender athlete participation in athletic events, specifically at the OSAA state track meet. This is a violation of [Board] policies: *AC – Nondiscrimination and JFCF – Hazing, Harassment, Intimidation, Cullying, Menacing, Cyberbullying, Teen Dating Violence, or Domestic Violence.*
>
> • There is evidence that he contacted coaches from other schools as the [LOHS] track coach prior to the state tournament asking them to submit letting and emails and calls to the OSAA office to deny the transgender student-athlete from McDaniel High School an opportunity to participate in the OSAA state track meet. This is a violation of [Board] policies: *AC – Nondiscrimination and JFCF – Hazing, Harassment, Intimidation, Cullying, Menacing, Cyberbullying, Teen Dating Violence, or Domestic Violence.*
>
> • There is evidence [plaintiff] communicated with student-athletes at the state meet, recommending they not participate in medal presentation if transgender student-athletes from McDaniel High School won either the 200 M or 400 M race. This is a violation of [Board] policies: *AC – Nondiscrimination and JFCF – Hazing, Harassment, Intimidation, Cullying, Menacing, Cyberbullying, Teen Dating Violence, or Domestic Violence.*
>
> • There is evidence [plaintiff] spoke with coaches, student-athletes, and their families before and during the state meet regarding what their athletes' plans were if the transgender student were to win and be on the medal stand. This is a violation of [Board] policies: *AC – Nondiscrimination and JFCF – Hazing, Harassment, Intimidation, Cullying, Menacing, Cyberbullying, Teen Dating Violence, or Domestic Violence.*
>
> • There is no evidence [plaintiff] spoke directly to the McDaniel transgender student-athlete on the podium at the medal presentation for the 200 M race.
>
> • There is evidence [plaintiff] spoke to the McDaniel transgender student-athlete on the podium during the medal presentation for the 400 M race. However, there is no evidence that this interaction was positive or negative.

> • There is no evidence [plaintiff] was riling up state tournament spectators in stands[.]
>
> • There is evidence [plaintiff] was insubordinate to the directive given by [Coleman] not to discuss issues related to transgender athlete participation in athletic events, specifically the OSAA state track meet.

*Id.* at 25-26. The "Summary" section then stated:

> After reviewing all of the information and circumstances around this incident, there is a preponderance of the evidence that indicates [plaintiff] was insubordinate and discriminated against the McDaniel High School transgender athlete . . . Follow-up with [plaintiff] is necessary.

*Id.* at 26. The "Summary" section concluded that "information about the follow-up [would] not be available to the complainant" – i.e., Haskins – and, consistent with District policy, apprised plaintiff of his right to file a complaint with Bailey if dissatisfied. *Id.*; Colyer Decl. Ex. 7, at 1 (doc. 74).

Colyer left the room to allow plaintiff to discuss the decision with his union representatives. O'Kasey Decl. 16 (doc. 74); Kilcullen Decl. Ex. 8, at 98-99 (doc. 89-8). She came back and asked plaintiff if he wished to give a "rebuttal or response." *Id.* Plaintiff offered his rebuttal. *Id.* Colyer told plaintiff that his LOHS cross-country and track coach positions for the 2024–25 school year would not be automatically renewed and instead would be opened for others to apply. *Id.* She nonetheless reiterated to plaintiff that the findings would not affect his ability to apply for another one-year special education assistant contract because he had done a "fantastic job" in that role. *Id.* at 15-16. The District paid plaintiff "in full for both his 2023-24 educational assistant contract and his Spring 2024 track-and-field coaching contract." Colyer Decl. ¶ 15 & Ex. 5 (doc. 74).

On June 17, after the school year had ended, the District posted job openings for the Fall 2024 cross-country head coaching position and Spring 2025 track coaching position at LOHS. Watson Decl. ¶¶ 2-3 (doc. 74).

On June 25, plaintiff sent a letter to Colyer, writing:

> This is official notice of my appeal of the termination of my position as Head Coach for Track & Field and Head Coach for Cross Country. You note the positions require applying yearly but that was not required prior to the 2024 track season nor has the process been done for all the other coaches at LOHS.
>
> The basis of the appeal is that the findings in the letter I was given on June 12, 2024, are not based on fact. Furthermore, the school has violated my First Amendment rights by terminating me for expressing my personal beliefs in support of Title IX . . . the school has also acted illegally as there is no evidence that the school has silenced all discussions on this topic, just that they have attempted to silence my position, which is in violation of the law . . . For all of the reasons above, I request immediate reinstatement to my positions as Head Coach of Track and Field, Head Coach of Cross Country, and restoration of my position in the Access program as an Instructional Assistant.

First Am. Compl. Ex. 6, at 1-2 (doc. 7-6).

On June 28, plaintiff sent an email to Jennifer Schiele, District Superintendent:

> I am formally requesting an appeal to the school board over the investigation that I responded to 2 days ago. Having not been provided guidance on the board appeal process I am requesting this from you at this time.
>
> The response that seems to be your view is that I was in one year positions in both coaching and as an instructional aide but those roles do NOT lose their 1st Amendment rights as was made clear in the decision Kennedy v Bremerton Schools in 2022. But the termination letter that principal Colyer handed me at the end of the meeting [made clear] that because of the investigation I was not being renewed.
>
> Given that I was never required to reapply for my coaching positions in prior years nor have any of the assistants or other coaches at LOHS and that Principal Colyer told me I was not being asked back because of these findings I am well within my rights and the policy to appeal both the findings and the subsequent decisions made regarding my employment based on those findings.
>
> It should be noted that I have spoken to many LO coaches in other sports led by football coaches and they are telling me they are 100% behind me and are waiting to see how my situation is finalized and they plan a significant response.
>
> I would hope you would have a 3rd party non-biased entity take a look at the failings of the initial complaint, some failures in the investigation led by a failure to consider my 1st Amendment protected rights and a failure to provide lawful evidence as protected in the 6th Amendment. I will await your response as does the Lake Oswego community.

Schiele Decl. Ex. 1, at 1-2 (doc. 74).

Schiele responded on July 1:

> I have reviewed your LOSD contracts and you signed two temporary contracts both of which have expired. There is no termination to appeal. You are welcome to apply for any 2024-25 positions. As we have said to your lawyer, please address any communication to the district's legal representative, Nancy Hungerford. I have included her in this email [along with her phone number]. Thank you!

*Id.* at 1. Schiele did not thereafter "hear anything further from plaintiff." Schiele Decl. ¶ 3 (doc. 74).

On July 18, the application period for the Fall 2024 cross-country head coaching position at LOHS was closed and the position filled. Watson Decl. ¶ 2 (doc. 74). On July 24, plaintiff initiated this lawsuit. On September 20, the application period for the Spring 2025 track coaching position at LOHS was closed and the position filled. *Id.* at ¶ 3. Plaintiff applied for both positions "at the advice of [his] attorneys." O'Kasey Decl. 16 (doc. 74); *but see* Colyer Decl. ¶ 16 (doc. 74); Watson Decl. ¶¶ 2-3 (doc. 74) ("[p]laintiff never submitted an application for the 2024-25 cross-county or track-and-field coaching position jobs posted by the District").

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

**DISCUSSION**

**I. Preliminary Issue**

The Court must address the PPS and School Defendants' evidentiary objection before reaching the substantive merits of the pending summary judgment motions. In particular, the PPS and School Defendants object to the declaration of as inadmissible and lacking an adequate foundation. Sch. Defs.' Reply to Mot. Summ. J. 6-7 (doc. 96); PPS Defs.' Reply to Mot. Summ. J. 9 (doc. 98). Plaintiff neglected to file a timely surreply in accordance with LR 56-1(b); *see also Justice v. Rockwell Collins, Inc.*, 117 F.Supp.3d 1119, 1134 (D. Or. 2015), *aff'd*, 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded") (citation and internal quotations and brackets omitted).

Regardless, the PPS and School Defendants' objections are well taken. , whose relationship with plaintiff, LOHS, this lawsuit, etc. is never defined within her declaration, purports to have been physically close enough to plaintiff at all points during the multi-day State Championship to be able to broadly avow that plaintiff "never" commented on the transgender

McDaniel athlete to "any spectators" or used the phrase "fucking dude," and was otherwise "entirely professional and respectful." Decl. ¶¶ 2-9 (doc. 90-1); *see also Fed. Trade Comm'n. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact").

Aside from the fact that affidavits must be made on personal knowledge and set forth such facts that would be admissible in evidence, statements are at direct odds with some of plaintiff's own narrative. *Block v. City of L.A.*, 253 F.3d 410, 419 (9th Cir. 2001); *cf. Brown v. Union Cnty.*, 2018 WL 3371597, *9 (D. Or. May 10), *adopted by* 2018 WL 3364663 (D. Or. July 9, 2018) (the plaintiff's subjective version of facts was insufficient to create a disputed issue of material fact where it "conflict[ed] with the plain evidence in the record and his deposition testimony"). The PPS and School Defendants' objections are granted.

## II. School Defendants

The School Defendants argue summary judgment is warranted because, "even if plaintiff engaged in constitutionally protected speech and suffered an adverse employment action, there is no genuine issue of material fact that plaintiff's contract would not have been renewed anyway." School Defs.' Mot. Summ. J. 2 (doc. 73). According to the School Defendants, plaintiff's "due process claims fail because: (1) plaintiff did not have a property interest in his temporary coaching job, and (2) no liberty interest was implicated, as the District made no public statements about the non-renewal." *Id.*

### A. First Amendment Claim

Plaintiff alleges the School Defendants violated his First Amendment rights by retaliating against him for sending the May 15, 2024, email to the OSAA. First Am. Compl. ¶¶ 82-96 (doc.

7). To prove a prima facie case of First Amendment retaliation, the plaintiff must demonstrate: (1) he engaged in protected speech; (2) the defendants took an "adverse employment action" against him; and (3) his protected speech was a "substantial or motivating" factor for the adverse employment action. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022). If the plaintiff meets this standard, the burden shifts to the defendants to show that they would have reached the same "adverse employment decision even in the absence of [the plaintiff's] protected conduct." *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 752 (9th Cir. 2010) (quotation marks omitted).

The School Defendants do not seriously contest that plaintiff meets the prima facie case requirements. School Defs.' Mot. Summ. J. 9 (doc. 73); *see also* Opinion & Order 20 (Nov. 25, 2024) (doc. 33) (finding that plaintiff established a prima facie First Amendment claim in relation to his request for a preliminary injunction); Sch. Defs.' Reply to Mot. Summ. J. 2 (doc. 96) (clarifying that "plaintiff's prima facie case . . . is not the basis of the District's motion").

The Court finds that undisputed evidence of record demonstrates the School Defendants would have launched an investigation into plaintiff and not renewed his contract irrespective of the May 15 email. As a preliminary matter, neither Coleman nor Colyer, once they knew about plaintiff's intent, and subsequent choice, to send the May 15 email to the OSAA made any negative comments related thereto. Further, plaintiff coached at the State Championship days later. It was not until Haskins' May 24 complaint that an investigation was initiated, and that investigation was mandated by both Oregon law and District policy. O'Kasey Decl. 29-30 (doc. 74); Colyer Decl. ¶ 17 & Ex. 7 (doc. 74); Vickers Decl. Ex. 1, at 51-52 (doc. 79-1); *see also* Or. Rev. Stat. § 339.356(2)(g) (Oregon school districts must adopt "uniform" procedures for the "prompt investigation of a report of an act of harassment, intimidation or bullying"). That is, Haskins

alleged that plaintiff engaged in a "premediated, calculated, and discriminatory campaign to create a hostile environment," and enumerated specific concerns about plaintiff. *See generally* Colyer Decl. Ex. 4 (doc. 74).

The Court understands that plaintiff disputes both Haskins's characterizations, as well as those of the witnesses that offered statements during Colyer's investigation. *See, e.g.*, Pl.'s Resp. to Sch. Defs.' Mot. Summ. J. 11-13 (doc. 88). However, that is not sufficient in the present context to obviate the School Defendants' "same decision" defense. Indeed, the School Defendants have put forth uncontravened evidence evincing that the District "would have opened up plaintiff's coaching positions at [LOHS] based solely on the report that plaintiff, while coaching the track and field team at the State Finals, had referred to a female transgender competitor as a 'fucking dude.'" Colyer Decl. ¶ 18 (doc. 74); Schiele Decl. ¶ 4 (doc. 74); *see also Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) (as amended) (affirming the district court's grant of summary judgment in favor of the defendants in regard to the plaintiff's First Amendment retaliation claim where the defendants would have "launched this [internal] investigation even absent [the plaintiff's protected] activity" due to the "serious" and "grave accusations" (even though the "the charges against [the plaintiff] proved unfounded")); *Baker v. United Parcel Serv.*, 2024 WL 5001476, *2 (9th Cir. Dec. 6, 2024) (affirming the district court's grant of summary judgment in favor of the defendant in regard to the "same action" defense where the adverse actions were taken pursuant to applicable policies).

Stated differently, any factual dispute surrounding whether plaintiff did or did not use such language is irrelevant because there is no indication Colyer had any reason to doubt the underlying

reports.[9] *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (granting summary judgment in favor of the defendant where the plaintiff "presented no evidence that [the defendant] did not honestly believe its proffered reasons" for the adverse employment action, even if those reasons were "foolish or trivial or even baseless") (citation and internal quotations omitted); *Kissner v. Loma Prieta Joint Union Elementary Sch. Dist.*, 2025 WL 263567, *1 (9th Cir. Jan. 22, 2025) (observing, in regard to the plaintiff's First Amendment retaliation claim, that "it is not important whether [the defendant's justifications for the adverse action] were objectively false in the sense of whether [the plaintiff] actually did what he was accused of doing"; uncontradicted evidence of "firsthand complaints that [the defendant] received from parents about [the plaintiff's] conduct" was sufficient) (citations and internal quotations omitted).

This is especially true considering that the School Defendants were in possession of other evidence confirming plaintiff's unprofessional conduct at the State Championship. *Cf. Howard v. City of Coos Bay*, 871 F.3d 1032, 1047 (9th Cir. 2017) (considering the "broader . . . context" of the defendant's employment decisions in evaluating a "same action" defense). Plaintiff was specifically instructed by Coleman and Colyer not to address the issue of transgender athletic participation at the State Championships. Multiple witnesses told Colyer that plaintiff defied those instructions and repeatedly raised the issue during May 17 and 18 with athletes, coaches, and parents from other schools. And plaintiff concedes he told Foster that "this can't happen again" –

---

[9] Plaintiff nonetheless glosses over this caselaw and instead maintains a reasonable jury "could easily conclude that Lake Oswego terminated [him] because of his protected advocacy" in light of Colyer's June 12 "Complaint Findings and Summary." Pl.'s Resp. to Sch. Defs.' Mot. Summ. J. 10 (doc. 88). Specifically, plaintiff argues "Colyer's own summary explicitly links the 'non-renewal' to the OSAA letter, which she claimed 'violated board policy,'" which he then characterizes as "direct evidence of retaliatory intent." *Id.* (citation omitted). The Court disagrees. Although Colyer's "Complaint Findings and Summary" did address plaintiff's May 15 email by way of background, it explicitly linked the non-renewal decision to plaintiff's behavior at the State Championship.

i.e., that "girls [should not have to] compete against transgender athletes" – after the McDaniel student made the podium. Kilcullen Decl. Ex. 8, at 86-89, 167-68, 184-85 (doc. 89-8).

Additionally, Coleman, who was responsible for reviewing the performance of all coaches, stated under penalty of perjury: "Based on my overall review of plaintiff during the 2023-2024 track season, as documented in [his most recent performance review], I was not going to offer [plaintiff] another contract as the [LOHS] track coach." Coleman Decl. ¶¶ 2-3 & Ex. 1 (doc. 75); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Boyle*, 429 U.S. 274, 286 (1977) ("[a] borderline or marginal candidate . . . ought not to be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record"). The School Defendants' motion is granted as to plaintiff First Amendment retaliation claim.

### B. Fourteenth Amendment Claim

Plaintiff alleges the School Defendants violated his Fourteenth Amendment rights by spreading "[t]he false allegations that [he] engaged in discrimination as a result of his [May 15 email, which] impinges on his good name, reputation, honor, and integrity." First Am. Compl. ¶¶ 97-120 (doc. 7). He also asserts "the investigation into him falsely stated that his coaching contract required yearly applications"; even so, he was not re-hired upon re-applying "though he is well qualified." *Id.* "A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest,[10] and (2) a denial of adequate procedural

[10] Via his response, plaintiff seemingly concedes that he did not possess a property interest in continued employment as either a coach or educational assistant. *See, e.g.*, Pl.'s Resp. to Sch. Defs.' Mot. Summ. J. 1, 13 (doc. 88); *see also Brady v. Gebbie*, 859 F.2d 1543, 1553 (9th Cir. 1988) ("at-will employment . . . bars [a] property claim [but] does not preclude [a] liberty claim"); *Setty v. State Bd. of Higher Educ.*, 1988 WL 72907, *1 (9th Cir. July 5, 1988) (a plaintiff "possesses no protected property interest in the renewal of his contract [because] Oregon laws provide no contract renewal protection for an instructor under a fixed-term appointment" and "[a]

protections." *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002) (citation and internal quotations omitted).

Initially, no liberty interest is implicated when a contract employee is simply not offered automatic renewal. *See Bd. of Regents v. Roth*, 408 U.S. 564, 575 (1972) (the mere fact that "respondent was not rehired for one year at one university" was insufficient to establish a liberty interest: "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another").

In contrast, "[a] liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality." *Brady*, 859 F.2d at 1552 (citation and internal quotations and brackets omitted). Claimed injury to reputation alone, or the claimed loss of future income/employment opportunities, are not sufficient to establish a deprivation of a liberty interest protected by the Constitution. *Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 971 (9th Cir. 2010). "Rather, due process protections apply only if a plaintiff is subjected to 'stigma plus'; i.e., if the state makes a charge against a plaintiff that might seriously damage his standing and associations in the community, and 1) the accuracy of the charge is contested, 2) there is some public disclosure of the charge, and 3) it is made in connection with the termination of employment or the alteration of some right or status recognized by state law." *Wegner v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002) (citation and internal quotations omitted).

Here, Colyer's "Complaint Findings and Summary" does not contain any charges of moral turpitude, dishonesty, or other serious character flaws. It states only that the preponderance of evidence showed plaintiff was insubordinate, insofar as he failed to follow Coleman's directives

---

few statements holding out the possibility of renewal upon satisfactory performance do not create a valid expectation of renewal that rises to the level of a property interest") (citations omitted).

not to discuss transgender issues at the State Championship (which he admittedly did), and violated District policy. O'Kasey Decl. 25-26 (doc. 74); *see also Gray v. Union Cnty. Intermediate Educ. Dist.*, 520 F.2d 803, 806 (9th Cir. 1975) (letter announcing the nonrenewal of the plaintiff's contract – which related to, among other things, charges of "insubordination, incompetence, hostility toward authority, and aggressive behavior" – was "not complimentary and suggest[ed] problems in relating to some people [but did] not import serious character defects such as dishonesty or immorality [and therefore] did not deprive her of 'liberty'").

Moreover, there is no indication that the School Defendants published any statement about plaintiff's non-renewal, which is dispositive in this context. *See Wegner*, 282 F.3d at 1074 (dismissing the plaintiff's Due Process claim where "he has not alleged that the [defendant] made any negative statements in connection with his discharge"); *see also Cox v. Roskelley*, 359 F.3d 1105, 1111 (9th Cir. 2004) (procedural protections apply if there is some public disclosure of improper conduct that resulted in discharge, disclosed at time of discharge). As noted, plaintiff relies exclusively on Colyer's "Complaint Findings and Summary" as the basis of his Due Process claim – but, as plaintiff acknowledges, this document was shared only with "entities within the Oregon education and high school athletic community." Pl.'s Resp. to Sch. Defs.' Mot. Summ. J. 14 (doc. 88) (citation omitted).

In particular, Colyer's "Complaint Findings and Summary" was shared with Coleman, Watson, Bailey, and plaintiff and his union representatives – i.e., plaintiff and other involved parties. O'Kasey Decl. 25-26 (doc. 74); *cf. Tarhuni v. Holder*, 8 F.Supp.3d 1253, 1274 (D. Or. 2014) (public disclosure "requires that the defendant actually disseminate the stigmatizing comments in a way that would reach the community at large," such that "[d]isclosures to other government agencies or to an opposing litigating party are not 'public' for purposes of 'stigma

plus'") (citations and internal quotations and ellipses omitted). Significantly, at his deposition, plaintiff could not (and has not since) identified any individuals that indicated his reputation was harmed or that he did not get jobs due to what happened with LOHS.[11] Kilcullen Decl. Ex. 8, at 133-40 (doc. 89-8).

Even assuming plaintiff identified a liberty interest and corresponding stigma, his opposition is silent as to any purported lack of process. *See generally* Pl.'s Resp. to Sch. Defs.' Mot. Summ. J. (doc. 88). In any event, the record demonstrates plaintiff was provided with process prior to his contract non-renewal. Namely, on May 29, Colyer met with plaintiff to inform him of the complaint and provide him with a copy. Plaintiff was accompanied by two union representatives and was given the opportunity to respond to questions about each specific allegation against him.

At the conclusion of the investigation on June 12, Colyer and the LOHS vice-principal met with plaintiff, who was again accompanied by two union representatives. Colyer presented plaintiff with the written investigation findings and then left the room to allow plaintiff to discuss those findings with his representatives. Colyer came back and asked plaintiff if he wished to give a rebuttal, which he then did. This is sufficient. *Cf. Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543-46 (1985) (an employee must be provided "some opportunity" to present his side before a termination; the "essential requirements" of due process "are notice and an opportunity to respond . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

[11] Plaintiff stated at his deposition that he told everyone in his circle "why he believed he was no longer working" at LOHS, noting it was "pretty public information at this point." Kilcullen Decl. Ex. 8, at 137 (doc. 89-8). It is beyond dispute that plaintiff, on his own, gave news media interviews less than a week after Colyer's June 12, 2024, report, claiming that the District fired him in response to his views on transgender athletics. *See, e.g.*, *id.* at 135.

To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee"). The School Defendants' motion is granted as to plaintiff's Fourteenth Amendment claim.

**III. PPS Defendants**

The PPS Defendants assert they are entitled to "[a]bsolute immunity and the qualified privilege." PPS Defs.' Mot. Summ. J. 2 (doc. 78). Separately, the PPS Defendants maintain that "plaintiff cannot establish the elements of his defamation claim" because plaintiff is a limited public figure and Haskins "did not act with actual malice," his "factual statements were true," and any "remaining statements were expressions of opinion. *Id.* at 2, 9.

Plaintiff alleges Haskins's May 24 email was defamatory and that PPS is vicariously liable for Haskins's statements. First Am. Compl. ¶¶ 122-47 (doc. 7). "To establish a claim for defamation, a plaintiff must show that a defendant made a defamatory statement about the plaintiff and published the statement to a third party." *Neumann v. Liles*, 358 Or. 706, 711, 369 P.3d 1117 (2016). "A defamatory statement is one that would subject the plaintiff to hatred, contempt or ridicule or tend to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held or to excite adverse, derogatory or unpleasant feelings or opinions against the plaintiff." *Id.* (citation and internal quotations, brackets, and ellipses omitted).

**A. Absolute Privilege**

Absolute privilege applies to otherwise-defamatory statements made by public officials acting "in the performance of [their] official duties." *Shearer v. Lambert*, 274 Or. 449, 455, 547 P.2d 98 (1976). While the absolute privilege does not extend to "all public employees," it does attach to "officers equivalent to the university department head in *Shearer*." *Lowell v. Medford Sch. Dist. 549C*, 370 Or. 79, 91, 95-96 (2022).

Both parties take succor from *Lowell*'s interpretation of *Shearer*. On the one hand, the PPS Defendants assert "Haskins is equivalent to the department head in *Shearer*" because he "is the Senior Director of Athletics at PPS, a public school district [and] oversees athletic programs for all of Oregon's largest school district's students in grades six through twelve." PPS Defs.' Mot. Summ. J. 9-10 (doc. 78). Conversely, plaintiff contends that, "[u]nlike the department head in *Shearer*, Haskins has no supervisory authority over [him as he] was a coach in an entirely different school district." Pl.'s Resp. to PPS Defs.' Mot. Summ. J. 7 (doc. 86). According to plaintiff, this "distinction is critical [because in] *Shearer*, the defendant's allegedly defamatory statements arose directly from his responsibility to supervise a subordinate within his own department." *Id.* at 8.

The PPS Defendants' motion presents a close question. Without engaging in an exegesis of the absolute privilege under Oregon law – especially since *Lowell* relatively recently visited this precise issue before holding that three public school employees, two of which were in the plaintiff's supervisory chain, did not qualify for this privilege – the Court finds that the PPS Defendants have not carried their burden in regard to this issue. Notably, the PPS Defendants devote two terse paragraphs to the issue in their motion and cite to no authority extending the privilege to a similarly situated public employee or analogous circumstances. *See, e.g.*, PPS Defs.' Mot. Summ. J. 9-10 (doc. 78); PPS Defs.' Reply to Mot. Summ. J.1-3 (doc. 98).

This shortcoming is significant in light of the PPS Defendants' recognition that *Shearer*'s holding was limited to "a department chair's statements about a subordinate . . . because they arose from the official's supervisory responsibilities and personnel management functions." PPS Defs.' Reply to Mot. Summ. J. 2 (doc. 98). In sum, given the briefing, the Court declines to address this issue further and the PPS Defendants' motion is conditionally denied in this regard. *Cf. Klopman-Baerselman v. Air & Liquid Sys. Corp.*, 2019 WL 6827350, *3 (W.D. Wash. Dec. 12, 2019)

(refusing to consider the defendant's summary judgment argument surrounding punitive damages as "inadequately briefed," denoting that "neither [the defendant] nor Plaintiff show that punitive damages are or are not authorized by statute").

**B. Qualified Privilege**

Oregon law recognizes a qualified privilege for good faith statements made: (1) "to protect the defendant's interests," (2) "to protect the plaintiff's employer's interests," or (3) "on a subject of mutual concern to the defendant and the persons to whom the statement was made." *DeLong v. Yu Enters.*, 334 Or. 166, 171, 47 P.3d 8 (2002) (citation and internal quotations omitted). The privilege "requires a plaintiff to prove that a defendant acted with actual malice." *Id.* at 170.

Here, the PPS Defendants' argument fares much better. Plaintiff does not contest that "Haskins's letter falls into categories one and three." PPS Defs.' Mot. Summ. J. 11 (doc. 78); *see generally* Pl's. Resp. to PPS Defs.' Mot. Summ. J. (doc. 86). Nor does he provide any argument or evidence that Haskins acted with actual malice, except to the extent he contends Haskins forfeited the privilege "by failing to verify career-ending allegations" and "through excessive publication to unnecessary third parties." Pl.'s Resp. to PPS Defs.' Mot. Summ. J. 10-14 (doc. 86) (citing *Lund v. Arbonne Int'l, Inc.*, 132 Or.App. 87, 96, 887 P.2d 817 (1994)).

However, neither of these assertions are borne out by the record, and the arguments of counsel do "not constitute evidence." *Carrillo-Gonzalez v. Immigr. &. Naturalization Serv.*, 353 F.3d 1077, 1079 (9th Cir. 2003); *see also Anderson*, 477 U.S. at 252 (in order to defeat a motion for summary judgment "there must be evidence on which the jury could reasonably find for the [non-moving party]"); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) ("conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment").

Namely, the record demonstrates that Haskins met with a number of coaches and students present at the State Championship, and also directly witnessed some of the behavior that formed the basis of his email prior to sending it. Vickers Decl. Ex. 1, at 5-36 (doc. 79-1); Vickers Decl. Ex. 3, at 16-17 (doc. 79-3); Kilcullen Decl. Ex. 2, at 2-3, 5-6, 9, 12-15, 19 (doc. 89-2); Kilcullen Decl. Ex. 9, at 40-41 (doc. 89-9); Vickers Decl. Ex. 1, at 2 (doc. 99-1). And, although plaintiff attacks Haskins' characterization of his May 15 email as an "effort to stop A.G. from participating in the state track meet" (since Haskins had not yet read that email), plaintiff admitted in his own deposition that his intent, in part, was precisely as Haskins surmised – i.e., to prevent transgendered students from competing in regular track meet events. Pl.'s Resp. to PPS Defs.' Mot. Summ. J. 5, 10, 13 (doc. 86) (citation and internal quotations and brackets omitted); *see, e.g.*, Kilcullen Decl. Ex. 8, at 143-47 (doc. 89-8).

Further, the universe of recipients was reasonable given the circumstances. That is, Haskins sent his May 24 email to a handful of individuals he reasonably believed necessary to accomplish the privileged purpose. *See Lund*, 132 Or.App. at 96 (affirming the grant of summary judgment on qualified privilege grounds where the defendant's "publications were made to and by persons who shared a business interest [and] the statements were on a matter of mutual concern that could affect them all . . . There was no evidence from which it could be found that defendants had no reasonable belief in the truth of the statements or that they acted with an improper motive"). The undisputed purpose of Haskins's complaint was to trigger an investigation into the alleged misconduct by plaintiff. That the complaint was sent to multiple individuals, including the OSAA and plaintiff's most recent public school employer, does not make Haskins's disclosure unreasonable. Plaintiff's defamation claim is barred by the qualified privilege and the PPS' defendants' motion is granted as to this issue.

**C. Claim Elements**

If the plaintiff is a limited purpose public figure, he must "prove that the allegedly defamatory statement was made with actual malice – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 924 (9th Cir. 2002) (citations and internal quotations omitted). Truth is also "a complete defense to a claim for defamation under Oregon law." *Cohen v. Carreon*, 94 F.Supp.2d 1112, 1116 (D. Or. 2000). Further, "full constitutional protection is afforded to statements regarding matters of public concern that are not sufficiently factual to be capable of being proved false and statements that cannot reasonably be interpreted as stating actual facts." *Neumann*, 358 Or. at 714. "The dispositive question . . . is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact about the plaintiff." *Id.* at 715.

Plaintiff's briefing wholly neglects to respond to the PPS Defendants' opinion and limited public figure arguments. Presuming, without deciding, that plaintiff qualifies as a limited public figure, as discussed in Section III(B), plaintiff has failed to come forth with any evidence of actual malice. The Court, however, rejects the PPS Defendants' contention that Haskins' statements did not pertain to verifiable facts.

Nevertheless, many of Haskins' statements appear to be true based on the record before the Court. Specifically, the undisputed evidence establishes that plaintiff: sent the May 15 email to effectuate a rule change that would prevent transgendered students from participating in regular track meets (specifically referencing the transgendered McDaniel student's performance and impact on plaintiff's star athlete by way of example); had been in contact with other coaches and families prior to the State Championship in an effort to change the rules (which would have prevented the transgendered McDaniel student from participating); spoke to other coaches and

students at the State Championship about protesting during the medal ceremony by not participating (which he purportedly did not encourage or discourage); and made a comment to the transgendered McDaniel student while she was on the podium about her participation (although he denies using the word "fair" or "unfair"). *See, e.g.*, Vickers Decl. Ex. 2, at 17-18 (doc. 79-2); Vickers Decl. Ex. 3, at 4-6, 9, 13-14 (doc. 79-3); Vickers Decl. Ex. 4, at 1 (doc. 79-4); Vickers Decl. Ex. 8, at 1 (doc. 79-8); Kilcullen Decl. Ex. 8, at 58-65, 68, 70-72, 86-89, 92-93, 143-44, 148-49, 154-61, 165-71, 177-79, 181-85, 193-94, 201-03 (doc. 89-8).

**IV. OSAA**

OSAA contends it is entitled to summary judgment "because there is no question of fact that the OSAA cannot be held liable for the letter written by Marshall Haskins to Lake Oswego High School: Mr. Haskins was neither an employee nor an agent of the OSAA." OSAA's Mot. Summ. J. 2 (doc. 80).

Plaintiff alleges the OSAA is vicariously liable under either a respondeat superior or agency theory for Haskins' defamatory May 24 statements. First Am. Compl. ¶¶ 122-47 (doc. 7); OSAA's Mot. Summ. J. 4 (doc. 80); Pl.'s Resp. to OSAA's Mot. Summ. J. 6, 9 (doc. 84). To establish that an employee/volunteer's act was within the scope of employment sufficient to demonstrate respondeat superior, the plaintiff must demonstrate: "(1) the conduct occurred substantially within the time and space limits authorized by the employment; (2) the employee was motivated, at least in part, by a purpose to serve the employer; and (3) the act was of a kind that he was authorized or hired to perform." *Coney v. Fagan*, 195 Or.App. 282, 286-87, 97 P.3d 1252 (2004) (citation and internal quotations omitted).

Agency "results from the manifestation of consent by one person to another that the other shall act on behalf and subject to his control, and consent by the other so to act." *Viado v. Domino's*

*Pizza, LLC*, 230 Or.App. 531, 533, 217 P.3d 199 (2009) (citation and internal quotations omitted). Thus, a principal is liable for the actions of a nonemployee agent only if those actions "are within the actual or apparent authorization of the principal." *Jensen v. Medley*, 336 Or. 222, 231, 82 P.3d 149 (2003); *see also Harkness v. Platten*, 359 Or. 715, 721-22, 375 P.3d 521 (2016) ("[a]pparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations") (citation and internal quotations omitted).

Plaintiff premises his respondeat superior and agency arguments on three purported facts: Haskins "sent the defamatory communication at the express direction of OSAA Associate Director Kelly Foster," he "copied the OSAA executive director and associate director," and he holds the title of "OSAA Executive Board Member and sits on the Diversity, Equity, and Inclusion Committee." Pl.'s Resp. to OSAA's Mot. Summ. J. 2, 7-9 (doc. 84).

Plaintiff misconstrues the record. Foster affirmatively denied telling Haskins to file a complaint; instead, she informed him of what she had observed because he was at the State Championship "as a representative for Portland Public" and she thought "he should communicate with [Coleman at] Lake Oswego, which was [the] normal [course] if there's a conflict at [a multi-school] event." Philbin Decl. 13, 16-17, 19 (doc. 85). Further, as denoted in Section III(B), the fact that Haskins sent the email to a small group of stakeholders, including the OSAA, is not sufficient to establish liability in this context. Finally, plaintiff, perhaps better than most, should understand that Haskins' inclusion of his titles in his email does not necessarily indicate that he was writing on behalf of those organizations. *Compare* Radmacher Decl. Ex. 202, at 6-8 (doc. 82-1) (plaintiff testifying that, even though he first and foremost identified himself as the LOHS track coach in

his May 15 email, he was not writing on behalf of LOHS: "it was just a statement of fact [and also to reflect he] was an individual long experienced in this sport [and] not just some . . . yahoo"), *with* Radmacher Decl. Ex. 203, at 6-7 (doc. 82-2) (Haskins testifying that he identified himself as a PPS employee and OSAA Board Member because his experience in education is "vast" and to "establish . . . credibility that [he']s not Joe Schmoe off the street").

As such, neither of these tests appear to be met. First, there is no indication Foster's comments to Haskins, or his decision to write the May 24 email, had anything to do with his role as an OSAA Board Member. There is a dearth of evidence to suggest Haskins had regular hours with the OSAA or that he was operating within those hours at the point in time he sent the email. And the uncontroverted record evinces that Haskins does not draft OSAA policies, he merely votes on them along with 14 other board members and cannot act unilaterally. Radmacher Decl. Ex. 203, at 2, 10 (doc. 82-2); *see also* Weber Decl. ¶ 2 & Ex. 201 (doc. 81) ("the OSAA's Governance Handbook [sets forth the] Executive Board's duties [and] none of those items of authorization include making a complaint . . . no member of the Executive Board has authority to act on their own [and the board] can only act by voting on proposals and/or resolutions").

Second, plaintiff has provided no evidence to refute Weber's statement that "neither Mr. Haskins nor any other member of the Board are authorized to act or speak for the OSAA, and in writing his letter, Mr. Haskins was not acting on behalf of the OSAA." Weber Decl. ¶ 2 (doc. 81). Importantly, Haskins' email itself does not suggest in any way that his writing had anything to do with his role on the OSAA Executive Board.

In fact, the apparent purpose of Haskins' email was to initiate an investigation into plaintiff's conduct at the State Championship due to information that had been relayed to him out of concern or that he had personally observed as a spectator. See Radmacher Decl. Ex. 203, at 11

(doc. 82-2) (Haskins testifying that he sent the May 24 email because his job at PPS "is to make sure our kids are in safe environments, and [the State Championship] clearly became an unsafe environment" so he "file[d] a formal complaint with the other two school districts about their employee's behavior"); *cf. Miller v. Salem Merchant Patrol, Inc.,* 165 Or.App. 266, 271, 995 P.2d 1206 (2000) (affirming the grant of summary judgment in favor of the defendant in regard to the second respondeat superior element where the employee testified "he was acting as a good citizen, not on behalf of defendant," when he allegedly engaged in tortious conduct, even though he identified himself by using his employment title during his interaction with the plaintiff).

Third, plaintiff fails to show that, by virtue of his role on the OSAA Executive Board, Haskins was authorized or hired to lodge discrimination or coaching performance complaints. While plaintiff is correct that the OSAA Executive Board – as a whole – can investigate and evaluate matters relative to the violation of regulations, there is no evidence that any such investigation or agenda item was addressed by the OSAA. Had the OSAA Executive Board decided to investigate or sanction plaintiff, and empowered Haskins to undertake those acts, then the OSAA could be liable, assuming Haskins' email was tortious. But the OSAA did not pursue that course of action, nor is there evidence that the OSAA otherwise controlled Haskins in his decision to write and send the May 24 email. *See Miller,* 165 Or.App. at 271-72 (affirming the grant of summary judgment in favor of the defendant concerning the third respondeat superior element where the defendant's president testified that the employee's alleged tortious acts were "not part of the job [he] was hired to perform"); *see also Prasnikar v. Our Savior's Lutheran Church of Lake Oswego*, 79 F.Supp.3d 1184,1186-89 (D. Or. 2015) (granting summary judgment in favor of the defendant in relation to plaintiff's respondeat superior and agency theories where there was no evidence the defendant had complete control over the plaintiff's volunteer actions).

## RECOMMENDATION

For the reasons stated herein, the School Defendants, PPS Defendants, and OSAA's Motions for Summary Judgment (docs. 73, 78, 80) should be granted and judgement should be prepared dismissing this case. The parties' requests for oral argument are denied as unnecessary.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 26th day of May, 2026.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge